An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-348

NORTH CAROLINA COURT OF APPEALS

Filed: 19 August 2014

IN THE MATTER OF:

                                        Forsyth County
                                        No. 11 JT 216
M.S.


Appeal by respondent-father from order entered 30 December 2013 by Judge Denise S. Hartsfield in Forsyth County District Court. Heard in the Court of Appeals 22 July 2014.

> *Theresa A. Boucher for petitioner-appellee.*
>
> *Womble Carlyle Sandridge & Rice, LLP*, *by Murray C. Greason, III, for guardian ad litem.*
>
> *Mark Hayes for respondent-appellant.*


ERVIN, Judge.


Respondent-Father Johnny S. appeals from an order terminating his parental rights in his son, M.S.[1] On appeal, Respondent-Father contends that the trial court erred by allowing the Forsyth County Department of Social Services to cease attempting to reunify Respondent-Father with Marvin on the grounds that the trial court failed to make required findings of

---

[1] M.S. will be referred to throughout the remainder of this opinion as "Marvin," a pseudonym used for ease of reading and to protect the juvenile's privacy.

fact and that the trial court erred by terminating Respondent-Father's parental rights in Marvin without making findings of fact concerning the likelihood that Marvin would be adopted. After careful consideration of Respondent-Father's challenges to the trial court's order in light of the record and the applicable law, we conclude that the trial court's order should be affirmed.

## I. Factual Background

Marvin was born in September 2000. After the death of his mother in June 2011, Marvin resided with his half-brother's paternal aunt. On 25 August 2011, DSS obtained non-secure custody of Marvin and filed a petition alleging that Marvin was a neglected and dependent juvenile based, in part, on allegations that Respondent-Father's whereabouts were unknown, that Respondent-Father had an extensive history of engaging in criminal activity, and that DSS had received reports that Respondent-Father had engaged in substance abuse and acts of domestic violence and that he had mistreated Marvin. In addition to noting Marvin's struggles with grief, attention deficit and hyperactivity disorder, and educational difficulties, DSS also alleged that Marvin's caretaker had been unable to enroll him in school.

On 4 November 2011, Marvin was adjudicated a neglected and dependent juvenile. Although Respondent-Father attended the hearing with his counsel, he "stood mute" when given an opportunity to address the allegations advanced in the petition. In its order, the court found that Respondent-Father had called DSS on 23 August 2011 while indicating that he did not have a phone number. Respondent-Father told DSS that he wanted Marvin to live with him at his mother's residence in Newport, North Carolina, and scheduled a meeting with a social worker for 24 August 2011. Subsequently, however, Respondent-Father rescheduled the 24 August 2011 meeting. Aside from the fact that Respondent-Father had no home address, his mother told DSS that he had not resided in Newport for six months.

In its dispositional order, the court ordered Respondent-Father to maintain contact with DSS and keep DSS updated concerning the location of his residence and his current contact information. In light of his assertion that he wished to be reunited with Marvin, Respondent-Father was ordered to complete substance abuse, mental health, and parenting assessments and to comply with any resulting recommendations; to submit to random drug testing; and to maintain a safe and stable residence.

Respondent-Father did not attend the next review hearing, which was held on 13 January 2012. In an order entered 6

February 2012, the court found that Respondent-Father had signed a case plan on 20 December 2011 and requested that a home study be performed concerning his mother's Newport residence. A subsequent home study revealed that Respondent-Father's mother could not provide a permanent placement for Marvin. Similarly, a home study of the residence of Respondent-Father's sister established that, due to space limitations and an inability to supervise the child, her residence was not suitable for Marvin either.

In a review order entered 4 May 2012, the court found that Respondent-Father had maintained only "limited contact" with DSS and that he had been charged with robbery with a dangerous weapon and assault with a deadly weapon on 3 March 2012. In addition, Respondent-Father had a pending misdemeanor assault charge in Carteret County.

Although a permanency planning hearing had been scheduled for 6 July 2012, that proceeding was continued until 3 August 2012 at the request of Respondent-Father's counsel. In a 27 August 2012 permanency planning order, the trial court found that Respondent-Father had failed to contact DSS following his release from incarceration on 22 April 2012 and that he had not responded to letters mailed to the address that he had previously provided to DSS. In addition, the trial court found

that Respondent-Father had not made any progress in satisfying the requirements of his case plan, inquired about Marvin's well-being, or availed himself of the opportunity to communicate with Marvin by mail as had been previously authorized. As a result, the trial court established a permanent plan of adoption for Marvin and relieved DSS of any responsibility for making further efforts to reunify Marvin with Respondent-Father. Despite this change, the trial court ordered DSS to "provide assistance to [Respondent-Father] to locate and obtain the court ordered services upon his specific request."

On 3 October 2012, DSS filed a petition seeking the termination of Respondent-Father's parental rights in Marvin. After holding a hearing concerning the issues raised by the termination petition on 4 February 2013, continued from 7 January 2013 in order to have Respondent-Father transported from jail, the trial court entered an order terminating Respondent-Father's parental rights in Marvin on 13 February 2013. As a result of the fact that he was incarcerated and did not, for that reason, receive notice of the hearing concerning the termination petition, Respondent-Father filed a motion to have the termination order set aside on 10 September 2013. With the consent of the parties, the trial court entered an order granting Respondent-Father's motion on 13 September 2013 and

held a new hearing to consider the issues raised by the termination petition on 2 December 2013 and 6 December 2013.

On 30 December 2013, the trial court entered an order terminating Respondent-Father's parental rights in Marvin. According to the trial court's findings of fact, Respondent-Father had made no progress in satisfying the requirements of his case plan during the 27 months that Marvin had been in foster care. In addition, the trial court found that Respondent-Father had not obtained substance abuse, mental health, domestic violence, and parenting capacity assessments or submitted to random drug testing. Moreover, the trial court found that Respondent-Father had failed to maintain contact with DSS, obtain and maintain appropriate housing, demonstrate an ability to provide for Marvin's basic needs, or send "any cards, gifts or letters to his son[.]" Finally, the trial court found that Respondent-Father was on probation, that his probation officer had filed a violation report against Respondent-Father, and that new criminal charges were pending against Respondent-Father. Based on these findings of fact, the trial court determined that Respondent-Father's parental rights in Marvin were subject to termination for neglect as authorized by N.C. Gen. Stat. § 7B-1111(a)(1) and for willfully leaving Marvin in foster care for more than twelve months without making

reasonable progress toward correcting the conditions that led to Marvin's removal from the home as authorized by N.C. Gen. Stat. § 7B-1111(a)(2), and that Marvin's best interests would be served by the termination of Respondent-Father's parental rights. Respondent-Father noted an appeal to this Court from the trial court's order.

## II. Cessation of Reunification Efforts Order

In the first argument advanced in his brief, Respondent-Father contends that the trial court erred by authorizing the cessation of efforts to reunify him with Marvin. More specifically, Respondent-Father argues that the order in which the trial court terminated DSS's obligation to attempt to reunify Respondent-Father with Marvin failed to contain findings of fact addressing the issue of whether further efforts at reunification would be futile or contrary to Marvin's interest in obtaining a safe, permanent home within a reasonable period of time as required by N.C. Gen. Stat. § 7B-507(b)(1). We decline, however, to consider the merits of Respondent-Father's challenge to the trial court's order authorizing the cessation of efforts to reunify him with Marvin.

As Respondent-Father notes, an appeal may be taken from an order authorizing the cessation of efforts to reunify a juvenile with his or her parents "together with an appeal of the

termination of parental rights order[.]" N.C. Gen. Stat. § 7B-1001(a)(5)(a). In view of the fact that he failed to designate the order authorizing DSS to refrain from making further efforts to reunify Respondent-Father with Marvin in his written notice of appeal, *see* N.C.R. App. P. 3.1(a); N.C. Gen. Stat. § 7B-1001(b), Respondent-Father has requested this Court, in the exercise of its discretion, to issue a writ of *certiorari* authorizing review of the trial court's order authorizing the cessation of any efforts to reunify Respondent-Father and Marvin. As a result of the fact that the record contains the order which Respondent-Father wishes to challenge and the fact that Respondent-Father has obtained authorization to amend the record on appeal to include a reference to his challenge to the order terminating DSS's responsibility for engaging in further reunification efforts in the list of issues that he proposes to raise on appeal, Respondent-Father asserts that "[a]ll of the[] requirements" necessary to preserve his right to appeal the order authorizing the cessation of further efforts to reunify Respondent-Father and Marvin have been satisfied except for his failure to file a separate notice of appeal from the order in question as required by N.C. Gen. Stat. § 7B-1001(b).

At the time that the trial court authorized the cessation of efforts to reunify Respondent-Father and Marvin,[2] N.C. Gen. Stat. § 7B-507(c) provided that, "[a]t any hearing at which the court orders that reunification efforts shall cease, the affected parent . . . may give notice to preserve the right to appeal that order in accordance with [N.C. Gen. Stat. §] 7B-1001." N.C. Gen. Stat. § 7B-507(c) (2011). According to N.C. Gen. Stat. § 7B-1001 as it existed at that time, a parent who noted an appeal from an order terminating his parental rights could also appeal "[a]n order entered under [N.C. Gen. Stat. §] 7B-507(c) with rights to appeal properly preserved as provided in that subsection[.]" N.C. Gen. Stat. § 7B-1001(a)(5) (2011). As a result, in order to properly note an appeal from an order authorizing the cessation of reunification efforts, the parent must have "properly preserved [the right of appeal] as provided in [N.C. Gen. Stat. § 7B-507(c)]" by giving "notice to preserve the right to appeal that order" at the "hearing at which the court orders that reunification efforts shall cease[.]"[3] N.C.

---

[2]The General Assembly amended both N.C. Gen. Stat. § 7B-507(c) and N.C. Gen. Stat. § 7B-1001 in 2013, *see* 2013 N.C. Sess. Laws ch. 129, §§ 15, 31, with the amended versions of these statutory provisions applicable "to actions filed or pending on or after" 1 October 2013. 2013 N.C. Sess. Laws ch. 129, § 41.

[3]According to the amended version of N.C. Gen. Stat. § 7B-1001(b), a parent wishing to appeal from an order authorizing the cessation of reunification efforts must file written "notice

Gen. Stat. § 7B-507(c); N.C. Gen. Stat. § 7B-1001(a)(5) (2011). "If parents fail to comply with any step of the preservation process, they have waived appellate review." *In re L.M.T.*, 367 N.C. 165, 182-83, 752 S.E.2d 453, 464 (2013) (Beasley, J., concurring) (citing *In re S.C.R.*, 198 N.C. App. 525, 531, 679 S.E.2d 905, 908-09, *appeal dismissed*, 363 N.C. 654, 686 S.E.2d 676 (2009)). Aside from his failure to acknowledge that he was required to "give notice to preserve the right to appeal" at the hearing at which the cessation of efforts to reunify him with Marvin was authorized, Respondent-Father has failed to provide this Court with a transcript of the 2 August 2012 permanency planning hearing, a fact that precludes us from determining whether he provided the requisite notice of his intent to appeal the order authorizing the cessation of efforts to reunify him with Marvin at that proceeding.

As a general proposition, "[t]he writ of *certiorari* may be issued in appropriate circumstances . . . to permit review of the judgments and orders of trial tribunals when the right to

_____

to preserve the right to appeal . . . within 30 days after entry and service of the order[.]" 2013 N.C. Sess. Laws ch. 129, § 31. As a result of the fact that the General Assembly had not enacted the amended version of N.C. Gen. Stat. § 7B-1001(b) as of the date upon which the trial court authorized the cessation of further efforts to reunify Respondent-Father and Marvin, the written notice requirement contained in the current version of N.C. Gen. Stat. § 7B-1001(b) cannot be deemed applicable to Respondent-Father.

prosecute an appeal has been lost by failure to take timely action[.]" N.C.R. App. P. 21(a)(1). The "appropriate circumstances" needed to support the issuance of a writ of *certiorari* are, ordinarily, facts demonstrating that "the right of appeal has been lost through no fault of the petitioner" or "by reason of excusable neglect[.]" *Johnson v. Taylor*, 257 N.C. 740, 743-44, 127 S.E.2d 533, 535 (1962) (quotation marks omitted). A careful review of the record provides no explanation for either Respondent-Father's failure to list the order authorizing the cessation of efforts to reunify him with Marvin in his notice of appeal or for his failure to demonstrate that he had properly preserved his right to appeal that order as required by N.C. Gen. Stat. § 7B-507(c) (2011). Under that set of circumstances, we are not inclined to exercise our discretion and grant the requested writ of *certiorari* in order to reach the merits of Respondent-Father's challenge to the order authorizing the cessation of reunification efforts. As a result, Respondent-Father's petition for the issuance of a writ of *certiorari* should be, and hereby is, denied, a decision that obviates the necessity for us to consider the merits of his challenge to the trial court's decision to authorize termination of the reunification process.[4]

---

[4]In the event that we were to reach the merits of

### III. Adequacy of Dispositional Findings

In his sole challenge to the trial court's termination order, Respondent-Father contends that the trial court erred by terminating his parental rights without making findings of fact concerning the likelihood that Marvin would be adopted. More specifically, after noting that the likelihood that the juvenile will be adopted is one of the factors that a trial court must consider at the dispositional phase of a termination proceeding, N.C. Gen. Stat. § 7B-1110(a)(2), Respondent-Father contends that he is entitled to relief from the trial court's dispositional decision on the grounds that the trial court failed to make

---

Respondent-Father's challenge to the trial court's order authorizing the cessation of efforts to reunify Respondent-Father and Marvin, we would have no hesitation in concluding that the findings of fact contained in that order adequately establish that further efforts to reunify Respondent-Father with Marvin would be "futile" and "inconsistent with [Marvin's] . . . need for a safe, permanent home within a reasonable period of time." N.C. Gen. Stat. § 7B-507(b). *In re L.M.T.*, 367 N.C. at 165-66, 752 S.E.2d at 454 (stating that the findings in an order such as the one at issue here "need not recite the statutory language verbatim" and are sufficient in the event that they "address the substance of the statutory requirements"). The trial court's findings that Respondent-Father had failed to contact DSS upon his release from incarceration, failed to make any progress in satisfying the requirements of his case plan, failed to inquire about or make any attempt to communicate with Marvin by letter, and lacked the ability to provide a home for Marvin clearly demonstrate that further reunification efforts would be an exercise in futility and inconsistent with Marvin's interest in obtaining a safe, permanent home within a reasonable period of time.

findings of fact addressing the adoptability issue. We do not find Respondent-Father's argument persuasive.

After a trial court has found the existence of one or more of the grounds for termination of parental rights specified in N.C. Gen. Stat. § 7B-1111(a), it must "determine whether terminating the parent's rights is in the juvenile's best interest." N.C. Gen. Stat. § 7B-1110(a). In making its dispositional decision,

> the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C. Gen. Stat. § 7B-1110(a). Although N.C. Gen. Stat. § 7B-1110(a) "requires the trial court to 'consider' all six of the listed factors," the relevant statutory language, instead of

requiring "written findings with respect to all six factors," simply requires the trial court to make "written findings . . . concerning only those factors 'that are relevant.'" *In re D.H.*, __ N.C. App. __, __, 753 S.E.2d 732, 735 (2014) (citing *In re J.L.H.*, __ N.C. App. __, __, 741 S.E.2d 333, 338 (2012)). In order for a factor to be deemed "relevant" for purposes of the findings requirement set out in N.C. Gen. Stat. § 7B-1110(a), there must be some "conflicting evidence concerning" the factor, such that it is "placed in issue by virtue of the evidence presented before the trial court[.]" *Id.* at __ n.3, 753 S.E.2d at 735 n.3. "We review the trial court's determination that a termination of parental rights is in the best interest of the juvenile for an abuse of discretion." *In re S.R.*, 207 N.C. App. 102, 110, 698 S.E.2d 535, 541, *disc. review denied*, 364 N.C. 620, 705 S.E.2d 371 (2010).

The trial court clearly "considered" the likelihood of Marvin's adoption in making its dispositional decision as required by N.C. Gen. Stat. § 7B-1110(a)(2). After hearing testimony from Marvin, his social workers, and his prospective adoptive parent, the trial court orally opined that "[t]he likelihood of adoption of the juvenile is pretty good" and stated that "the bottom line is that, I think, that [the prospective adoptive parent] is, or can be, in a position to be

an adoptive home placement. And she has clearly said that she loves [Marvin] . . . . So the likelihood, I think, is great."

In its written order, the trial court found as fact that:

23. [Marvin] is 13 years old. He is currently placed in a therapeutic foster home. He desires to be adopted by his cousin [], but if that is not possible he would like to be adopted by another family.

. . . .

25. [Marvin] . . . was hospitalized in the Brenner's Children's Hospital psychiatric unit, then placed in a therapeutic foster home, hospitalized for a second time at Brenner's Children's Hospital, transferred to Central Regional Hospital in Raleigh and then admitted to a psychiatric residential treatment facility (PRTF) in Charlotte on June 1, 2012. He was discharged into a therapeutic foster home in May 2013 and is transitioning into the home of his cousin[.]

. . . .

31. [Marvin's cousin] has expressed her desire to adopt [Marvin]. [The prospective adoptive parent] is [Marvin's] maternal cousin. She has known him all of his life. She loves [Marvin] and maintained contact with him throughout the time he has been in DSS custody. [Marvin] has expressed his desire to be adopted by [his cousin] and become a part of her family. While on visits to her home, [Marvin] continues to have contact with his adult siblings.

   32. The permanent plan for [Marvin] is
     Adoption[.]

Respondent-Father has not challenged these findings of fact, which thoroughly assess the relevant issues bearing upon the adoptability issue as required by N.C. Gen. Stat. § 7B-1110(a)(2), as lacking in adequate evidentiary support.

Aside from the fact that the trial court's findings clearly address the factors relevant to a determination of Marvin's adoptability and indicate that he is likely to be adopted by his cousin, a careful review of the hearing transcript has satisfied us that the record does not contain "conflicting evidence" concerning the likelihood that Marvin will be adopted in the event that Respondent-Father's parental rights are terminated. *In re D.H.*, __ N.C. App. at __ n.3, 753 S.E.2d at 735 n.3. Macon Baird, a social worker, testified that Marvin's permanent plan was adoption; that DSS had identified Marvin's cousin as "a prospective adoptive family for [Marvin;]" that Marvin's cousin had visited him regularly since November 2012; and that Marvin was "[e]xcited" to join her family. Similarly, David Byrd, another social worker, explained that Marvin was currently living in a licensed foster home because, "[o]nce [he] was released from Alexander Youth Network, it was a determination then from his treatment team that he be stepped down to therapeutic foster care to address his mental health needs, and

then also to work on his relationship with [his cousin]." Marvin's cousin was awaiting approval as an adoptive placement, a process which required a pre-placement assessment. Even so, DSS had already conducted a home study of Marvin's cousin's residence and was in the process of having a pre-placement assessment, which Mr. Byrd described as "an enhanced version of a home study[,]" performed. Having observed Marvin's weekend visitations with his cousin, Mr. Byrd had no "concerns with [Marvin] visiting or staying in [his cousin's] home[.]" Marvin's cousin expressed her desire to adopt Marvin, testifying that "I would love him to come and live within my home and be a part of our family." Asked to describe her relationship with Marvin, his cousin replied, "He's just like my [three] kids. . . . He's just a natural fit there." Finally, Marvin testified that, while he hoped to be adopted by his cousin, he was also "open to being adopted by another family[.]" As a result, the undisputed record establishes that Marvin's cousin wishes to adopt him, that she has an established relationship with Marvin, that she believes that Marvin will fit in well with the other members of her family, and that the steps necessary for the adoption to be effectuated are well underway.

In attempting to persuade us that the trial court was required to make written findings addressing the adoptability

issue as required by N.C. Gen. Stat. § 7B-1110(a)(2), Respondent-Father directs our attention to evidence tending to show that Marvin "had significant emotional and behavioral issues" that had led to his placement in a residential treatment facility. Despite the fact that the record does contain evidence concerning the nature and extent of the emotional and behavioral issues that confront Marvin, the trial court did not hear any evidence tending to show that the existence of these concerns reduced the likelihood that Marvin's cousin would adopt him. Although Respondent-Father suggests that Marvin's cousin "stated that she would need some kind of outside assistance if she adopted [Marvin,]" the testimony to which Respondent-Father directs our attention in support of this argument contradicts Respondent-Father's assertion:

> Q. You're willing to do what's necessary to get [Marvin] what he needs?
>
> [Marvin's cousin]. Yes.
>
> . . . .
>
> Q. Been through it before?
>
> A. Yes, I have. I've got three kids and nieces and nephews. I know how they grow.
>
> Q. And you've known [Marvin] before all this happened?
>
> A. Yes.
>
> Q. You were attached to him?

A. Yes.

Q. Would you take him into your home if you weren't going to receive money?

Q. Yes.

. . . .

Q. If there wasn't assistance from DSS, or the government, or somebody else, you would still take [Marvin] into your home?

A. Yes.

Q. Would that create a financial hardship for you?

A. I have a very good extended family, and we would pull together and make it work.

Finally, the record provides us with no reason to believe that the results of the pre-placement assessment would be adverse to the proposed adoption. Thus, given the absence of any indication in the record developed at the termination hearing that Marvin's cousin would be unwilling or unable to adopt Marvin, the adoptability was not in genuine dispute before the trial court.

As a result, we conclude that the trial court properly considered the likelihood that Marvin would be adopted as required by N.C. Gen. Stat. § 7B-1110(a)(2) in the course of determining Marvin's best interests. In addition, given that the likelihood that Marvin's cousin would be willing and able to

adopt him was not "placed in issue by virtue of the evidence presented before the trial court[,]" the adoptability issue was not "raised as a relevant factor *in this case.*"  *In re D.H.*, __ N.C. App. at __ n.3, 753 S.E.2d at 735 & n.3.  For that reason, even though the termination order does, in fact, adequately address the adoptability issue, the trial court was not required to make written findings concerning this factor.  *Id.* (stating that, "in the case *sub judice*, though the ages of the children were properly 'considered,' respondent does not point to any evidence indicating that the age of any child was placed in issue such that this factor was 'relevant'").  Therefore, Respondent-Father is not entitled to relief from the trial court's termination order based upon this contention.

## IV. Conclusion

Thus, for the reasons set forth above, Respondent-Father is not entitled to relief from the trial court's order on the basis of either of the arguments advanced in his brief.  As a result, the trial court's order should be, and hereby is, affirmed.

AFFIRMED.

Judges McGEE and STEELMAN concur.

Report per Rule 30(e).